UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

BRITTNI ORNER,                          :

          Plaintiff,                      :   CIVIL ACTION NO. 3:24-cv-2278

          v.                              :       (JUDGE MANNION)

KEYSTONE PC HOLDINGS LLC                :
t/a SMILES FOR KEEPS and
CHILDSMILES PC HOLDINGS NJ              :
PA t/a SMILES 4 KEEPS,

                          :

          Defendants.                     :

## MEMORANDUM

Before the Court is a motion for summary judgment filed by Keystone PC Holdings LLC t/a Smiles for Keeps and Childsmiles PC Holdings NJ PA t/a Smiles 4 Keeps (collectively, "Defendants"). (**Doc. 14**). For the reasons set forth below, Defendants' motion will be **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion will be **GRANTED** with respect to Brittni Orner's ("Plaintiff") claim that she was passed over for a new position in violation of Title VII and the Pennsylvania Human Relations Act ("PHRA") and **DENIED** with respect to Plaintiff's claim that she was wrongfully terminated in violation of Title VII and the PHRA. Thus, Plaintiff's claim for wrongful termination will proceed to trial.

## I.    BACKGROUND[1]

Plaintiff began her employment with Defendants in June 2022 as a dental assistant with a pay rate of $23.00 per hour, which was generally higher than what Defendants' other dental assistants were making. (Docs. 14-2, ¶5; 15, ¶5; 14-6, ¶10; 14-7 at 62:12-62:23, 109:11-109:24). Plaintiff had been studying to become a registered dental hygienist ("RDH"), and Defendants told Plaintiff that they planned to hire her as an RDH once she successfully passed the required examinations. (Doc. 14-6, ¶12). Plaintiff alleged that she was promised a $2.00/hour raise, however, Defendants' Vice President of HR, Mark Seber ("Seber"), clarified that Plaintiff would receive a raise only after she became an RDH. (Doc. 14-7 at 94:5-95:20, 125:15-127:23). Nonetheless, Plaintiff received a pay raise to $24.00/hour for a team lead position, which she briefly held before stepping down. *Id.* at

---

[1] As required by Local Rule 56.1, Defendants have filed a statement of material facts, and Plaintiff has filed a statement responding to the numbered paragraphs in Defendants' statement of material facts. (Docs. 14-2, 15). For purposes of this motion only, the Court refers to these averments.

62:24-63:16. Despite stepping down, Plaintiff's pay remained at $24.00/hour. *Id.* at 95:14-19.

Plaintiff took her National Board Dental Hygiene Examination ("NBDHE") test in August 2023, and Defendants paid the $580.00 testing fee. (Doc. 14-7 at 240:20-241:12). Plaintiff failed the exam five times. *Id.* at 33:6-33:8. Nonetheless, Seber assured Plaintiff:

> Our primary goal is to see you obtain your RDH license and progress to the next level. RDHs perform very well and it will be a significant increase for you in terms of income. We sincerely hope you can attain that license soon.

(Doc. 14-10 at 3). While Plaintiff had still not yet obtained her RDH certification, she applied for a team lead position within the hygiene department. (Doc. 14-7 at 130:5-131:6). Defendants filled the open RDH "team lead" position with another candidate, John Piezer ("Piezer"). (Docs.

14-6, ¶15; 14-7 AT 131:14-19). Plaintiff testified that she believes Piezer is less qualified for the team lead position than she is:

Q. . . . Is your understanding that he was a less qualified candidate solely based on the fact that he had been at the company less time than you had been?

A. No, I knew his dental background.

Q. What was his dental background?

A. He worked for an oral surgery office prior and then he was an EFDA as well, but he didn't maintain his license.

Q. Okay. So at some point, he had additional certifications beyond what you had, but it's your understanding that those had lapsed?

A. Yes. But it was the hygiene side, so I knew more about the hygiene because I went to hygiene school and it's more in-depth than EFDA school.

. . .

Q. So is it your personal belief that a dental assistant assisting a dental practice on the oral surgery side would have less

- 4 -

> experience as a dental assistant than a dental assistant on the dental hygienist side?
>
> . . .
>
> **A**. Yes.

(Doc. 14-7 at 132:9-133:20). Yet, Plaintiff agreed that she was not qualified to fill the team lead position at the time Piezer was hired, given that she had not yet obtained her RDH certification. *Id.* at 117:17-119:7.

While Plaintiff was on vacation, she confronted Melissa Wright ("Wright"), her office manager, about Piezer's hiring. (Doc. 14-10 at 5-7). Wright assured Plaintiff: "Brittni this does not change your future with us at all. We still have the same amount of hygienist[s] with the new hire while we wait for your test. [W]hen you pass we will be more than happy to consider you join our team of hygienist[s]." *Id.*

Plaintiff alleges that she was passed over for the team lead position in retaliation for a complaint she made to HR regarding alleged race discrimination. (Doc. 14-6, ¶20). Specifically, on August 27, 2023, Plaintiff emailed Seber and two other HR representatives regarding some concerns she had about the work environment. (Doc. 14-10 at 9-11). Plaintiff's email begins with general workplace complaints and eventually morphs into a complaint about racial discrimination. *See id.* Plaintiff admitted that she, personally, never felt that she had been discriminated against. (Doc. 14-7 at

- 5 -

203:15-203:17, 203:24-204:3). Nonetheless, HR performed interviews to investigate Plaintiff's claims. *Id.* at 202:10-203:3. At the end of the investigation, HR wrote Plaintiff, stating: "We have investigated the claims made before and have acted where needed." (Doc. 14-10 at 11).

After learning that Defendants hired Piezer for the position, Plaintiff emailed HR, stating:

> Hello, I just wanted to follow up and say I unfortunately wish I could say that the conversation and email with you did not affect the decision being made about who would be team lead in hygiene but I feel as if it did. They announced it to someone less qualified than me in running the hygiene department. Those words also came from the person chosen's mouth saying I'm not sure how I got it over you because you know everything here, I have to learn it. It's definitely because you made them mad. But it is what it is at this point. I just have to pass my board and figure out my future and where to go from there. I wanted to thank you for taking the time out of your schedule to come and talk with everyone. Have a good day!

(Doc. 14-10 at 2). Jared Cohen ("Cohen"), Director of Operations, stated that Plaintiff "was not the most qualified person for the job," noting that she would have been selected if she had been. (Doc. 14-10 at 1). Subsequently, HR offered Plaintiff a severance package, allegedly stating, "[w]ell, clearly you're miserable here." *Id.* at 211:20-211:23. The severance package offered

Plaintiff a month of pay, which Plaintiff declined. *Id.* at 225:7. Plaintiff responded to the severance package offer by claiming that if she could go work somewhere else, she would, but family obligations prevented her from doing so immediately. (Doc. 14-7 at 223:18-224:25).

On September 18, 2023, Cohen and Wright notified Plaintiff that her employment was terminated. *Id.* at 226:11. Cohen allegedly stated: "Clearly you know you've made pretty serious claims against [Wright] . . . We're no longer wanting you to be employed[.]" *Id.* at 226:14-226:16. On February 6, 2024, Plaintiff filed an EEOC claim with the PHRC. (Doc. 14-11). On August 13, 2024, Defendants submitted a position statement. (Doc. 14-12). On October 8, 2024, the EEOC indicated that it would not proceed further with the investigation, making no determination about whether further investigation would establish violations of the statute. (Doc. 14-13).

On December 31, 2024, Plaintiff filed a complaint against Defendants. (Docs. 1, 14-6). Plaintiff's complaint is twofold. Count I alleges that, because of her complaints to Human Resources ("HR") about "race discrimination" in the office, Defendants retaliated against her by: (1) passing over her for a "team lead" position; and (2) terminating her employment. (Doc. 14-6, ¶¶15-18, ¶¶23-25). Count II alleges wrongful discrimination in violation of the PHRA on the same grounds. (14-6, ¶¶26-32). On April 14, 2026, Defendants

- 7 -

filed the instant motion for summary judgment, concise statement of material facts, and accompanying brief. (Docs. 14, 14-2, 14-3). Plaintiff filed her answer to Defendants' concise statement of material facts, and brief in opposition. (Docs. 15, 16). Defendants filed their reply to Plaintiff's response on May 19, 2026. (Doc. 17). This matter is now ripe for disposition.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is [(1)] no genuine issue as to any material fact and [(2)] that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). Material facts are those that "might affect the outcome of the suit under the governing law," and a dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see*

*also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding that a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on a motion for summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge that burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. The moving party's burden has recently been explained this way:

> In interpreting Rule 56, the Supreme Court has outlined two closely related methods for a movant to succeed at summary judgment. First, under the standard approach, the moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*,

- 9 -

477 U.S. 242, 248–52 (1986) (explaining the meaning of the terms 'material' and 'genuine'). Second, under the *Celotex* approach, a moving party may instead demonstrate that the nonmoving party has not made "a showing sufficient to establish the existence of an element essential to that party's case ... *on which that party will bear the burden of proof at trial*." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added).

*Mall Chevrolet, Inc. v. General Motors LLC*, 99 F.4th 622 (3d Cir. 2024).

If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

- 10 -

## III.   DISCUSSION

### A. Count I: Title VII Retaliation

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

Retaliation claims brought under Title VII follow the burden-shifting framework established in *McDonnell Douglas Corp. v. Green. Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 543 (W.D. Pa. 2010) (citing 411 U.S. 792 (1973)). If the plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and if it successfully does, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that relation was the real reason for the employment action." *Id.* at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997). Therefore:

> [T]o defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-

discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action . . . Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations omitted).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. Cty. of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995)). If Plaintiff fails to raise a genuine issue of material fact as to *any* element of her *prima facie* case, summary judgment is warranted. *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996). Thus, the Court addresses each element in turn.

- 12 -

### a. Protected Activity

The United States Court of Appeals for the Third Circuit defined a "protected activity:"

> With respect to "protected activity," the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause") . . . Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII . . . Moreover, the employee's "opposition" to unlawful discrimination must not be equivocal[.]

*Moore*, 461 F.3d at 431 (internal citations omitted).

In *Moore*, the Third Circuit held that three white police officers engaged in a protected activity by notifying a sergeant's supervisor that the sergeant was treating black officers less favorably than white officers. 461 F.3d at 343 (citing *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135 (3d Cir. 2006)) ("'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.' To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, 'we look to the message being conveyed rather than the means of conveyance.'"). In that case, the white police officers

- 13 -

observed the sergeant refer to black officers by using racial slurs. *Moore*, 461 F.3d at 336.

In the case before us, Plaintiff sent an email to HR on August 27, 2023. In relevant part, Plaintiff's email stated:

> Another thing that needs to be addressed is the infamous pigeon incident . . . I watched an employee (the one who was originally blamed for the incident) in my department[, Emily,] in tears because she believed this was racially motivated and watched nothing be done about the situation once it was clear she was not involved. In my opinion it is due to the fact that the employee that was claiming to be targeted, [Wright] has stated she's "scared of" . . . The next thing that needs to [be] brought to attention is the employee surveys . . . A staff member in one of the reviews mentioned something about [Wright] saying racist comments. In an unprofessional manner, [Wright] spread that anonymous review throughout the office trying to find out who submitted it. She ended up making an announcement in huddle about how it is not tolerated in the office even though we've all heard many racially insensitive things come out of her mouth. I was made aware about a conversation had between all the team leads and the office manager where Sarah (work room team lead) made a comment about her being "nicer" to black children because "they are already at a disadvantage." My jaw literally dropped that these are the conversations being had on the clock, right

- 14 -

next to [Wright] and nothing coming of it. Another disgusting and completely inappropriate incident that happened involved someone I work close with in the hygiene department . . . [Wright] and Sarah pulled this person[,Sehar,] from hygiene just to ask her why she did not eat pork as someone who is Muslim. After explaining the beliefs/practices of the religion she was told it was both "weird" and "stupid" and was laughed at by both [Wright] and Sarah. That same employee dismissed herself and came back to the hygiene department visibly upset and angry, but didn't know what to do about the situation, since her own manager was the one to allow/poke fun at the insensitive comments made . . . What we currently have is someone that is not qualified in neither dentistry, assisting, or even hygiene that continues to play favorites and has clear racial biases.

(Doc. 14-11 at 9-14).

In her deposition, however, Plaintiff testified that Plaintiff's coworker Emily, not Plaintiff, believed that so-called "pigeon incident" was racially motivated because it occurred on Juneteenth. The discussion followed:

Q. Is it your belief, then, there wasn't any type of racial issue involved in the ["pigeon incident,"] right?
A. Right. Not with the pigeon incident, no. I don't believe it was racially motivated.

- 15 -

**Q.** So you weren't making—with respect to the pigeon incident, you weren't making a complaint about there being racial discrimination, right?

**A.** Not in this part, no.

(Doc. 14-7 at 160:24-161:7).

With respect to the incident regarding Sarah's comment about black children, Plaintiff admitted that she was not present for the alleged comment. *Id.* at 172:6-9. Even if she was, Title VII does not protect speech on topics unrelated to employment discrimination. *Slater v. Susquehanna Cnty.*, 613 F.Supp.2d 653, 663 (M.D.Pa. 2009) (citing *Wimmer v. Suffolk Cnty. Police Dep't*, 528 U.S. 964 (1999) (plaintiff police officer's report of fellow officer's discriminatory treatment of minorities not protected under Title VII). Regarding the incident involving Sehar, which if true, may be protected by Title VII; Plaintiff admitted that she was not present for the incident itself, but for Sehar's emotional response to the incident immediately after it occurred. *Id.* at 167:5-168:13. Plaintiff agreed that she was only physically present for Wright's statements made to the whole staff, "advising the group at large that it wasn't appropriate company policy to make insensitive comments of this nature[.]" *Id.* at 170:9-12.

For all the allegations regarding racial discrimination, Plaintiff admitted that she either was not complaining about racial discrimination or was

complaining about racial discrimination which she did not observe first-hand. The question therefore becomes whether an employee reporting alleged racial discrimination which she did not personally observe constitutes a "protected activity." A protected activity includes when employees "*oppose discrimination made unlawful by Title VII.*" *Moore*, 461 F.3d at 431 (internal citations omitted). Moreover, Plaintiff "must have held an objectively reasonable, good faith belief that her employer's activity was unlawful under Title VII. She need not prove the merits of the underlying discrimination complaint, but a reasonable person must be able to conclude that there was discrimination under Title VII." *Gress v. Temple Univ. Health Sys.*, 784 F.App'x 100, 106 (3d Cir. 2019).

One concern is that some of Plaintiff's allegations are based on potential hearsay evidence. However, "hearsay statements can be considered on a motion for summary judgment *if they are capable of being admissible at trial.*" *Fraternal Order of Police, Lodge 1 v. Cty. of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (internal citations omitted) (emphasis added). Plaintiff has identified the third-party declarants, and there is no suggestion that any of them are unable to testify at trial, or that hearsay exceptions or exemptions are inapplicable. Thus, this Court may consider

- 17 -

these statements for summary judgment purposes. *Vermeer v. Univ. of Delaware*, 710 F.Supp.3d 401, n.14 (D.Del. 2024).

Defendants argue that Plaintiff failed to prove she was engaged in a protected activity, because "any purported race-related concerns were speculative, secondhand, and not grounded in her own reasonable belief of unlawful discrimination." (Doc. 14-3 at 10). While it may be true that Plaintiff conceded that the so-called "pigeon incident" was not a complaint of race discrimination by Plaintiff's own admission (Doc. 14-7 at 160:24-161:3), Defendants fail to address Plaintiff's complaint involving a manager making fun of a Muslim employee. (Doc. 14-6 at 13). Given the nature of the allegation and the fact that Plaintiff was allegedly present to observe her Sehar's emotional response immediately after that incident, Plaintiff has satisfied the threshold requirement of making a *prima facie* showing that she engaged in a protected activity by emailing HR.

### b. Adverse Employment Action

For the second element, Plaintiff must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F.3d at 431 (internal citations omitted). Here, Plaintiff alleges that Defendants retaliated

- 18 -

against her when they passed over her for a team lead position, and when she was ultimately terminated. (Doc. 14-4, ¶¶29-30). Piezer, the individual who was hired over Plaintiff, allegedly told Plaintiff that she "definitely [had] a target on [her] back" and was surprised that he was hired over her. (Doc. 14-7 at 210:14-23). Additionally, Plaintiff testified that she had more experience in the hygiene department than Piezer did, and Piezer "was shocked he got it[.]" *Id.* at 133:11-136:3.

Plaintiff was also terminated. In her termination meeting, Cohen allegedly stated: "Clearly you know you've made pretty serious claims against [Wright] . . . We're no longer wanting you to be employed[.]" *Id.* at 226:14-226:16. These allegedly retaliatory actions, if true, "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F.3d at 431 (internal citations omitted). Therefore, Plaintiff has met her *prima facie* burden of showing that Defendants engaged in adverse employment actions by hiring Piezer for the team lead position and ultimately terminating Plaintiff.

### c. Causation

Finally, to establish the third element, "a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have

- 19 -

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore,* 461 F.3d at 431 (internal citations omitted). Here, Plaintiff alleges that she was passed over for the team lead position almost immediately after her email complaint. (Doc. 16 at 8). With respect to her termination, she presented testimony that the reason for her termination was due to her claims against Wright. (Doc. 14-7 at 226:14-226:16). Plaintiff also notes that she was offered severance just days after she complained to HR and before her termination. (Doc. 16 at 8). Therefore, Plaintiff has made a *prima facie* showing that her alleged retaliatory acts were causally connected to her protected activity.

### d. Burden-Shifting Analysis

Finding that Plaintiff established a *prima facie* case for her retaliation claim, the burden shifts to Defendants to offer "legitimate, non-discriminatory reasons for its action." *Fuentes,* 32 F.3d at 764. Indeed, Defendants "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981). Defendants' burden is a light one. *Fuentes,* 32 F.3d at 763.

With respect to Defendants' decision to hire Piezer over Plaintiff for the RDH team lead position, Defendants presented evidence that Cohen stated in an email: "[Plaintiff was not the most qualified person for the job[.]" (Doc.

- 20 -

14-10 at 2). Additionally, Plaintiff admitted that Piezer had more certifications than Plaintiff, and that she was otherwise unfamiliar with his educational background. (Doc. 14-7 at 132:17135:8).

With respect to her termination, Defendants note that Plaintiff stated on numerous occasions that she no longer wished to work for the company. (Docs. 14-3 at 14, 14-7 at 223:18-224:5). Defendants also note that Wright categorized Plaintiff's behavior as "insubordination." (Doc. 14-10 at 4). Thus, Defendants have carried their modest burden of articulating legitimate non-discriminatory reasons for hiring Piezer for the RDH team lead position and terminating Plaintiff's employment.

The burden therefore shifts back to Plaintiff, who "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. While the Court declines to evaluate the merits of Plaintiff's retaliation claim, it finds that Plaintiff has presented sufficient evidence such that a factfinder could reasonably disbelieve Defendants' nondiscriminatory reasons for her termination, particularly given Cohen's stated reasons for her termination.

- 21 -

However, Plaintiff has not presented sufficient evidence such that a fact finder could either disbelieve or find that a discriminatory reason was more likely than not a motivating cause of Defendants' decision to hire Piezer over Plaintiff for the RDH team lead position. By Plaintiff's own admission, Piezer had additional certifications which she did not have. Additionally, when Plaintiff was asked, "So this doesn't have to do with any type of racial discrimination. It has to deal with the fact that you felt [Wright] wasn't appropriately handling the hygiene role?" she responded, "Correct." (Doc. 14-7 at 183:12-16). Finally, Plaintiff agreed that she could not fill the RDH team lead position at the time Piezer was hired, given that she had not yet obtained her RDH certification. *Id.* at 118:25-119:7. Plaintiff has failed to present sufficient evidence such that a fact finder would disbelieve Defendants' assertions that Piezer was simply a more qualified candidate than Plaintiff.

A genuine issue of material fact exists as to whether Plaintiff was wrongfully terminated pursuant to Title VII retaliation. However, there is no genuine issue of material fact as to whether Defendants retaliated against Plaintiff by passing over her for the RDH team lead position. Thus, Defendants' motion for summary judgment will be **GRANTED** to the extent it

applies to Plaintiff's claim that she was denied a new role and **DENIED** to the extent it applies to Plaintiff's claim of wrongful termination.

### B. Count II: Pennsylvania Human Relations Act ("PHRA")

The Court next considers whether a genuine issue of material fact exists with respect to Count II of Plaintiff's complaint: discrimination under the PHRA. The PHRA is generally interpreted in accord with its federal counterpart, Title VII. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (citing *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995). "In the employment discrimination context, the analysis for adjudicating claims under the PHRA is *identical* to a Title VII analysis." *Larochelle v. Wilmac Corp.*, 210 F.Supp.3d 658, n.9 (E.D.Pa. 2016) (citing *Sheidemanle v. Slippery Rock Univ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) (emphasis added).

"In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies to discrimination claims brought under Title VII and the PHRA." *Donnelly v. Capital Vision Serv., LLC*, 644 F.Supp.3d 97, 104 (E.D.Pa. 2022) (citing *McDonnell Douglas*, 411 U.S. 792). Because the Court employed the *McDonnell Douglas* framework with respect to Plaintiff's Title VII claims, *supra*, the Court renders the same holding for Plaintiff's PHRA claims.

- 23 -

## IV.    CONCLUSION

After viewing the facts in the light most favorable to Plaintiff, the Court concludes with respect to Plaintiff's retaliation claim that she was wrongfully terminated, there are genuine issues of material fact with respect to whether: Plaintiff engaged in a protected activity; the termination was adverse employment action; the causation element of her retaliation claim could be satisfied; and Defendants had legitimate, non-discriminatory reasons for her termination. These issues will need to be resolved by a jury. Under these circumstances, the motion for summary judgment must be denied with respect to the retaliation claims based upon Plaintiff's termination.

- 25 -

The Court concludes, however, that Plaintiff did not adduce sufficient evidence to support her other retaliation claim—that she was passed over for an RDH team lead position. Summary judgment must be granted in Defendants' favor with respect to that claim. For the foregoing reasons, Defendants' motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART.** An appropriate order will follow. Additionally, a separate Order the Court will set a date for the final pretrial conference and trial in this matter.

**MALACHY E. MANNION**
**United States District Judge**

DATE: 5/26/26
24-2278-01